IN THE

# SUPREME COURT OF ERRORS

OF THE

# STATE OF CONNECTICUT.

| 56 | 1 |
| 61 | 138 |
| 56 | 1 |
| 63 | 341 |

JAMES POTTER'S APPEAL FROM PROBATE.

Fairfield County, Oct. T., 1887. PARK, C. J., CARPENTER, PARDEE, LOOMIS and STODDARD, Js.

An executor, having in his hands money of the estate to be paid over to the widow of the testator and his minor son, who were legatees, the widow being guardian of the son, advised the widow to take for herself and as guardian certain stocks and western mortgages, believing them to be good investments, and advising her to consult two other gentlemen on the subject. She consulted one of them, but it did not appear what advice he gave her or whether any. She soon after accepted the stock and mortgages, both for herself and as guardian. She had had no business experience and trusted the executor wholly in the matter, both as a friend and by reason of his relation to the estate. The executor was however acting as agent for the sale of the stock and mortgages, and received a large commission for the sales thus made. The stock soon after depreciated. The executor in recommending it had little personal knowledge of its real character and took no pains to inquire. The fact of his interest in the sales was kept secret from her and she would not have taken the property if she had known of it. Three years later she learned the fact of his receiving the commissions, and immediately, for herself and as guardian, repudiated the transaction and tendered back the stock and mortgages, with all she had received as dividends and interest. The executor credited himself on his administration account with the amount paid her as so much paid in cash, and in the final settlement of his account in the probate court the widow objected to these credits and the court disallowed them. On his appeal to the Superior Court, brought by appeal to this court, it was held—

1. That the relation of the executor to the widow was one of confidence, which imposed on him the obligation of fidelity to her interests in the matter.

2. That his conduct was an abuse of that confidence, which gave her the right to repudiate the transaction.

VOL. LVI.—1

3. That although so long a time had elapsed before she repudiated it and tendered back the property, yet as she had only then learned of his interest in the sales, it was not too late for such action on her part.

4. That her right to repudiate the transaction was independent of the fact of the depreciation of the property.

5. That it was not necessary that there should have been an actual fraudulent intent, but that the relation of the parties was such that the transaction was constructively fraudulent, and would be so regarded in equity.

6. That although the matter came before the probate court in the course of the settlement of the administration account, it was to be dealt with by that court in the same manner that it would have been by a court of equity.

7. That the transaction could not be regarded as one wholly between the widow and the executor as individuals, and so as one that she was to take proceedings to set aside, but that it was a violation of the duty of the executor as such, since it was his duty to pay the legacies in cash, and not in stocks and securites purchased with the money.

8. That it was not sufficient to require the executor to surrender to the widow the commissions he had received on the sales, but that the whole transaction was vitiated by the fraudulent element that entered into it.

A railroad bond was sold by the executor to the widow as guardian at the same time with the sale of the stock to her as guardian, but it did not appear that he had any interest in the sale nor that the sale was an unfair one, but only that it was property in which she had no right to invest guardian funds. Held that, if she had had at the time a right to repudiate the purchase, she had lost it by the three years delay.

There had been a partial administration account, including these credits, previously presented by the executor to the probate court, which had been accepted by the court, but parties interested were not notified or present. Held not to preclude objections to these items on the final accounting.

[Argued November 2d—decided December 1st, 1887.]

APPEAL from a probate decree settling the account of the appellant as executor of Ezra Curtis; taken to the Superior Court in Fairfield County, and heard before *Sanford, J.* The following facts were found by the court:—

Ezra Curtis died testate, October 17th, 1879, leaving surviving him Mary E. Curtis, his wife, and George E. Curtis, his minor son, nine years of age, both of whom are legatees under his will. By his will he appointed James Potter, the appellant, to be his executor. Potter duly qualified as executor and acted as such prior to and during the years

1882 and 1883, and up to the date of the trial of this action. Mr. Potter and Mr. Curtis had been acquainted with one another for many years prior to the death of the latter.

Mary E. Curtis, prior to the death of her husband, had had no business experience whatever. She was acquainted with Mr. Potter prior to her husband's death, and knew of the friendly relations existing between them, and knew from her husband that he had selected Mr. Potter to be his executor. Mrs. Curtis did not in any respect assume the control or management of the estate, or direct the investment of its funds, but relying entirely upon Mr. Potter, assented to such investments as he recommended and accepted the same. She had no knowledge of the fact that Mr. Potter was to and actually did receive a large commission on the investments hereinafter mentioned.

In April, 1882, Mr. Potter was, and for some time had been, acting as the agent for one John Hurd, in the sale of the stock of the Housatonic Rolling Stock Company, under an arrangement by which Hurd was to furnish the stock to Potter at $40 per share and Potter was to sell it at $50 per share. Hurd also had many other agents engaged in selling the stock under arrangements similar to those made with Mr. Potter, and Hurd himself frequently made sales of it to various individuals other than his agents at $40 per share.

Mr. Potter knew nothing of the character or value of the stock, except that it was being largely invested in by prominent and responsible citizens of Bridgeport, and that it was at that time paying good dividends, and Hurd told him that it would continue to pay such dividends if he had to pay them himself. He sought and received no further information on the subject. Mr. Potter was himself satisfied with this, and thereupon wrote to Mrs. Curtis, who was then residing at Norwalk, Conn., the following letter:

"BRIDGEPORT, April 4, 1882.

"*Dear Mrs. Curtis:* I should be pleased if you would come over on Friday if convenient. I am in receipt of funds from the yard, and wish to confer with you in regard

to them. I am suffering from a violent cold or I would come and see you. Come to dinner, Friday.

"Yours truly, JAMES POTTER."

At the interview had in consequence of this letter, Mr. Potter recommended this stock as an investment to Mrs. Curtis, for herself and as guardian for her son. He told her that it was a good investment, which he believed, and that he had some himself, which was true, and advised her to take one hundred shares of the stock for herself. He told her to consult her uncle, Mr. Bishop, and Mr. Lockwood, both of Norwalk, about the purchase of the stock. She did consult Mr. Bishop, and subsequently assented to its purchase. Mr. Potter, having money in the bank to the credit of his account as executor, drew two checks as executor, both dated April 13th, 1882, one for $5,000 and the other for $1,000, to the order of Mrs. Curtis, handed both checks to Mrs. Curtis and requested her to indorse the $5,000 check, which she did in his presence and immediately returned the same to him. The check for $1,000 Mrs. Curtis kept and used the same for her own purposes. The $5,000 check Potter gave to Hurd and received in return therefor a certificate for one hundred shares of the stock of the Housatonic Rolling Stock Company and the sum of $1,000 in money for himself for procuring the sale. The certificate of stock he gave to Mrs. Curtis and requested her to sign a receipt which he had drawn, bearing date April 13th, 1882, acknowledging the receipt of $6,000 in cash; which receipt Mrs. Curtis signed.

Mr. Potter knew that, as executor, he ought to pay the legacies in cash, and therefore took the receipt in this form. At the time he advised the purchase of this stock he knew that he was to receive a commission of one thousand dollars for the sale of the same to Mrs. Curtis.

In the spring of 1882 Mrs. Curtis was appointed guardian of her son, the said George E. Curtis; Caleb A Granniss becoming her bondsman.

In July, 1882, Mr. Potter in a similar manner induced Mrs. Curtis, as guardian of her son, to take one hundred

shares of the same stock for her son. This stock he paid for by his executor's check, dated July 18th, 1882, for $5,000, payable to the order of John Hurd, which check he handed to Hurd and received therefor a certificate of one hundred shares of the stock and $1,000 in money for himself for procuring the sale. The certificate he handed to Mrs. Curtis, and at the same time handed to her for her son a $1,000 bond of the Atchison & Pike's Peak Railroad Company, assuring her it was a good investment, and thereby inducing her to receive it, and took from her, as guardian, a receipt for $6,000 cash. He did not draw the checks for this amount to the order of Mrs. Curtis, for the reason that he considered such a course a useless formality and unnecessary.

Subsequently, in the month of July, 1882, Mr. Potter in a similar manner induced Mrs. Curtis to take Missouri farm mortgages for herself to the amount of $1,961.55, and as guardian for her son to the amount of $1,970.34, in all $3,931.89.

He told Mrs. Curtis to consult her uncle, Mr. Bishop, on this investment also. Mrs. Curtis did consult him. Mr. Potter bought these mortgages of Hurd, and paid for them by his executor's check to the order of John Hurd, and received from Hurd a commission of $78 for the transaction.

Subsequently Mr. Potter informed Mr. Granniss that Mrs. Curtis had with his, Potter's, advice and recommendation, invested $5,000 for her son George in stock of the Housatonic Rolling Stock Co. Granniss expressed his disapproval of such an investment of any part of the minor's portion of the estate. Subsequently to this, in January, 1884, Mrs. Curtis as guardian of her son, with the assistance and advice of Mr. Potter, rendered an account as such guardian to the probate court of Norwalk, wherein she credited herself with one hundred shares of the stock of the Rolling Stock Co., $5,000, one railroad bond, $1,000, and farm mortgages, $1,970.34. Subsequently to the rendering of this account Mr. Potter informed Mr Granniss that Mrs.

Curtis had rendered her account as guardian, and that the court had accepted it, with the stock in question in it.

The interest on the railroad bond and farm mortgages has been paid and a portion of the mortgages has been paid, principal and interest.

The Rolling Stock Company continued to pay dividends for about a year and a half or two years after April, 1882, and then ceased, and at the time of the trial of this action the stock was worth not to exceed from $5 to $7 per share.

The Housatonic Rolling Stock Co. was not an incorporated company, but an unincorporated association managed entirely by John Hurd. Mrs. Curtis would not have assented to these investments had she known their character, and that they were not such securities as were sanctioned by law for the investment by guardians of trust funds, but did so assent, relying upon the advice and recommendation of Mr. Potter and upon his relation to the estate.

Mr. Potter received $1,000 for his services as executor, and in addition thereto has been allowed about $900 for expenses and commissions to his agents for the care of real estate belonging to the estate. Mrs. Curtis did not know that Potter received commissions on the rolling stock and farm mortgage investments until he rendered his last account to the probate court in January, 1885, to which she objected.

Mrs. Curtis, at that time, tendered back to Mr. Potter the rolling stock, railroad bond and farm mortgages, and all accumulations thereon, and demanded from him the money paid for the same and interest thereon from the time of payment.

Prior to his death Mr. Curtis had been a member of the firm of Lyon, Curtis & Co., lumber merchants doing business in Bridgeport, Conn., and by a codicil to his will he appointed Caleb A. Granniss, also a member of the firm, to settle up his interest in the same, and to pay over the proceeds thereof to his executor. Mr. Granniss paid to Mr. Potter, as proceeds of the interest of Mr. Curtis in the firm, subsequent to April 1st, 1882, the sum of $33,476.17 in

cash; and it was a portion of the money thus received by Potter, that he invested as before stated in the stock, mortgages and railroad bond.

The stock is at present of small and uncertain value. There has been no default in the payment of interest on the farm mortgages, nor of the interest on the bond.

When the securities were purchased by Mr. Potter for and transferred to and accepted by Mrs. Curtis, he believed that all the statements made by him to her concerning all of them were true, and that they would be a safe and profitable investment for her and her son.

Upon the foregoing facts the appellant claimed that the order and decree of the court of probate should be wholly reversed. The appellee claimed, as matter of law—(1.) That Potter in his dealings with her concerning the funds of the estate was to be held responsible in law and equity as a trustee of funds in his hands. (2.) That because she relied on his judgment, integrity and good faith, she was entitled to tender back the property, and to receive cash from the executor in lieu thereof. (3.) That upon the facts found the appellee had a legal right to repudiate the transactions and claim and receive her money on tendering back the property sold. (4.) That because the appellee gave her assent to these investments without full knowledge of all the facts and circumstances, she was not bound by her assent.

The court held and decided that the decree of the probate court should be reversed in so far as it disallowed as a credit to the executor the amount of the actual cost to him of the securities in question, and affirmed so far as it disallowed as a credit the amounts received by him as commissions on the purchases. Both parties appealed.

*H. S. Sanford* and *C. Thompson*, for the original appellant.

1. The appellant, as executor, claims that he should be allowed in his administration account two items of credit entered therein as follows:

" Paid on legacy to Mrs. Curtis,    .    .      $7,961.55

Paid on legacy to Mrs. C., as guardian for son,  7,970.34 "

The appellee contends that $10,000 of this amount should be disallowed because it was invested in certain stock which has since depreciated in value.   Receipts in writing, signed by the appellee for herself and as guardian of her son, were given by her to the executor—one dated April 13th, 1882, and the other July 18th, 1882, each acknowledging the receipt of $6,000 in cash.   These receipts include the $10,000 paid by her for the stock.   These investments seem to have been carefully and deliberately made, not in the name or in behalf of the estate or executor, but in the name of herself and as guardian for her son ; the title to the stock passing directly to them from Mr. Hurd, the manager of the Housatonic Rolling Stock Co.

2. It is found that, at an interview in April, 1882, " Mr. Potter recommended this stock as an investment to Mrs. Curtis, for herself and as guardian for her son.   He told her that it was a good investment, which he believed, and that he had some himself, which was true, and advised her to take one hundred shares of the stock for herself.   He told her to consult her uncle, Mr. Bishop, and Mr. Lockwood, both of Norwalk, about the purchase of the stock. She did consult Mr. Bishop, and subsequently assented to its purchase."   It is also found that " in July, 1882, Potter in a similar manner induced Mrs. Curtis as guardian for her son to take one hundred shares of the stock for her son."   In each case he received from Hurd $1,000 in money for procuring the sale.   We submit confidently that there is no ambiguity about these transactions ; and that there was neither in fact, nor in law, nor in equity, any investment of the funds of the estate in this stock.   It was not the duty of the executor to invest the funds of the estate in any property.   The executor was not seeking an investment for the funds of the estate.   There is strictly no contract relation between an executor and the legatees.   He is bound to pay the legacies if he has assets.

3. We submit that the real question here is, whether the

executor paid these legatees $10,000 in 1882. That he intended and undertook to pay them, that he and they thought the legacies were paid, that they gave receipts therefor as paid in cash, and that the executor in fact paid them, admit of no doubt whatsoever. This is sustained by the claim of the appellee, that she would have a right by tendering back the property to rescind the contract and recover her money. The contracting parties were John Hurd, vendor, and Mrs. Curtis, vendee, and the only contract is between them. Her money passed to John Hurd, and his property passed to her. If the contract can be rescinded, then the property should be returned to Hurd by her, and the money recovered from him. Mr. Potter, as executor, had no right to take this stock from Hurd; and no more right to take it from Mrs. Curtis. It must be clear that she cannot recover her money if it has not been paid by her; and if it was paid by her then she had been paid by the executor, and the credits should be allowed him. And her receipts for the money would seem sufficient to estop her within the decisions of this court. *Fuller* v. *Crittenden*, 9 Conn., 401; *Elting* v. *Sturtevant*, 41 id., 182; *Potter* v. *Douglass*, 44 id., 541.

4. While we deny the existence of any contract between Mr. Potter and Mrs. Curtis, yet, if there was such a contract, we say that it is too late to rescind it now. Rescissions of contracts are not favored, and they are governed by well-settled rules. A party cannot rescind a sale or contract unless both parties can be placed in the same situation and can stand upon the same terms as existed when the contract was made. Even if the sale was made with a privilege of rescinding it, the vendee must rescind it within a reasonable time or the sale will be absolute. If there is no fraud and no right to rescind, the vendee cannot rescind because the goods are not conformable to the terms of the contract. In this case more than three years had passed since the stock was accepted, during which time dividends had been received, and the stock had been owned and controlled absolutely by the appellee. In January, 1884, the appellee rendered an

account as guardian of her son to the probate court of Norwalk, wherein she credited herself with one hundred shares of this stock at $5,000, which account was accepted and approved by the court. In 1882 it does not appear to have been worth less than she paid for it. In 1886 this stock is found to be worth from $5 to $7 per share. Evidently the contract, if any existed, could not have been rescinded and her money recovered back in 1886, without a violation of the above rules. It does not appear that she made a single complaint to Mr. Potter, or attempted in any way to rescind the contract with Mr. Hurd, or did anything whatever in the premises until November, 1885, when she first learned that he had received commissions on the rolling stock and farm mortgage investments. It clearly appears, therefore, that the ground of her complaint against Mr. Potter is that he received commissions on the sale of the stock.

5. The appellee claims that there is a constructive fraud. But the court finds that "when the securities were purchased by Potter for and transferred to and accepted by Mrs. Curtis, he believed that all the statements made by him to her concerning all of them were true, and that they would be a safe and profitable investment for her and her son." Mr. Potter was not the vendor, but the agent negotiating the sale. Even if he had been the vendor, his representation that he believed it was a good investment would not have been fraudulent; for a " mere representation, honestly made, and believed at the time to be true by the party making it, though not true in fact, does not amount to fraud." Willard's Equity, 149. "If the assertion is honestly believed to be true, no fraudulent intent will be presumed." Bispham's Equity, § 214. "Fraud is never presumed." *Dwight* v. *Brown*, 9 Conn., 91. It will never be inferred by law from facts stated, unless they show it necessarily and conclusively. *Thomas* v. *Mullain*, 44 Conn., 146. And Mr. Potter's words were mere words of recommendation and not a representation. They were merely an expression of opinion, on which Mrs. Curtis did not wholly rely, for she took, as

he advised her to do, the opinion of Mr. Bishop in the matter. 1 Morawetz on Corp., §§ 101, 104.

6. We deny that Mr. Potter was acting as a trustee for the widow and her child. As executor, he had no obligation resting on him to see that the legatees safely invested their money. His trust ceased as soon as the assets were paid to the legatees. Whether they invested them or not, or in what they invested them, was no part of his business. And we submit that if the investments had been made in a precisely similar manner in notes secured by first mortgages on real estate in this state, no question could have been made as to their being, in legal effect, payments to these legatees. These investments, therefore, are not to be condemned because of the manner in which they were made. All the complaints originate from two facts which appear in the record: that the investments appear to have depreciated in value; and that Mr. Potter received commissions on the sale of them. We contend that no rule of law or equity will justify the disallowance of these credits to the executor for either one or both of these facts. It is a matter of every day's experience that the very best stocks will fluctuate in value, and this very stock is worth to-day more than double its value in 1886, and may be in another year treble its value. The business carried on is legal and legitimate, and has been very profitable in the past. That it was mismanaged, and thereby depreciated, is no greater disappointment to che appellee than to the appellant. It is to be presumed that no one ever advised another to put his money into stock without believing it was a good investment, and that is all the representation that was made in this case.

7. The record says that " Mr. Potter knew nothing of the character or value of the stock, except that it was being largely invested in by prominent and responsible citizens of Bridgeport, and that it was at that time paying good dividends, and Mr. Hurd told him that it would continue to pay such dividends if he had to pay them himself." The names of the prominent and responsible citizens of Bridgeport who so largely invested in this stock the record does

not disclose, but it is well known that they include the most reputable and skillful financiers of Bridgeport, all of whom knew just as much of the character and value of this stock as did Mr. Potter and Mrs. Curtis, and no more, namely: that it was managed by John Hurd and paid good dividends. Mr. Hurd evidently commanded the respect and confidence of these citizens, who knew and apparently wanted to know no more than this. And to the great majority of investors there is no other way of showing a good investment except by its paying good dividends. The agents sold this stock for Mr. Hurd under an arrangement by which he furnished it to such purchasers as they procured, at $50 per share, and allowed the agents as commissions the excess over $40 per share, and this arrangement was carefully observed by them. Mr. Potter by this arrangement was bound to treat Mrs. Curtis just as others were treated, or violate the arrangement.

8. Finally, we submit that it is difficult to see how Mr. Potter can now be regarded in any sense as a trustee, after the payments have been made by him as aforesaid. "A trust, in its technical sense, is the right, enforceable solely in equity, to the beneficial enjoyment of property of which the legal title is in another." Bispham's Equity, § 49. One definition of a trustee is—"a person in whom some estate, interest or power in or affecting property of any description, is vested for the benefit of another." It relates to property. Mr. Potter does not now hold the money paid to these legatees, and he has not held the same since 1882.

*G. Stoddard*, with whom was *W. T. Haviland*, for the original appellee.

PARK, C. J. Mr. Potter, the original appellant, was executor of the will of Ezra Curtis, and in that capacity had in April and July, 1882, a large sum of money in his hands for payment to the legatees under the will. The legatees were Mary E. Curtis, the widow, and George E. Curtis, his son and only child, then twelve years old, of whom the widow was the legally appointed guardian. In paying over

portions of their shares to the widow on her own account and as guardian of her son, he advised her to take, and she, relying upon his advice and recommendation, took for herself one hundred shares of the Housatonic Rolling Stock Company at fifty dollars a share, coming to $5,000, and Missouri farm mortgages to the amount of $1,961.55, and as guardian of her son one hundred shares of the Housatonic Rolling Stock Company, at the same price, coming to $5,000, a thousand dollar bond of the Atchison & Pike's Peak Railroad Company at its face value, and Missouri farm mortgages to the amount of $1,970.34, making a total for herself of $6,961.55 and as guardian of her son of $7,970.34. For these two sums Mr. Potter credited himself in his account with the estate as executor, and presented the items for allowance by the probate court in a partial account rendered on the 14th of June, 1884, which account was accepted by the court. In his final account as executor, rendered to the probate court on the 22d day of March, 1886, these items were objected to by the widow on her own account and as guardian of her son, and were disallowed by the court. From that disallowance Mr. Potter took the present appeal to the Superior Court, which affirmed the probate decree in part and in part disaffirmed it, and from that judgment both parties have appealed to this court.

The court below made a finding of the facts in the case, from which it appears that Mrs. Curtis, the widow, prior to her husband's death had had no business experience whatever; that friendly relations had existed between her husband and Mr. Potter, of which she had known, as well as the fact that he had selected him for his executor; that she did not in any respect assume the management of the estate or direct as to investments of it, but relied entirely upon Mr. Potter, and assented to and accepted such investments as he recommended; and that she had no knowledge that Mr. Potter had any interest in her making the investments that have been mentioned, and that she would not have assented to them if she had known their character and that they were not securities in which she could lawfully invest

funds held by her as a guardian, but that she relied in the matter upon Mr. Potter's advice and recommendation and upon his relations to the estate.

Here we have then a widow, utterly ignorant of business, confiding in one whom she had known as her husband's personal friend and whom he had trusted with the settlement of his estate, and acting upon his advice, supposing, as she had a right to do, that he was disinterested in that advice and was acting solely in her interest, and giving her the benefit of his experience and intelligence, with the most friendly interest in her welfare. He on his part stood in a position, as executor of her husband's estate and, as such, a trustee for the legatees under his will, and as the recipient of her confidence and trust with regard to her business affairs, that imposed upon him the obligation of the highest fidelity to her interests, and rendered impeachable in equity any transaction into which she might be led by any want of such fidelity on his part.

Now what do we find the actual fact to be? The stock of the Housatonic Rolling Stock Company was a speculative stock, of the character or value of which it is found that Mr. Potter knew nothing, except that it was largely invested in by prominent and responsible citizens of Bridgeport and that it was at that time paying good dividends, and that the manager told him it would continue to do so, and that he sought no further information on the subject. It is found however that it was not an incorporated company but was managed as an unincorporated association entirely by one Hurd. This is a fact that Mr. Potter, himself a stockholder, could easily have ascertained, and was bound to have ascertained before assuming to advise an investment in it by Mrs. Curtis, who as a stockholder might be held in law a partner and so might be subjected to great and perhaps ruinous loss by its insolvency. As a matter of fact the company paid dividends but two years longer, and at the time of the trial the stock was worth only from $5 to $7 a share.

We have then, thus far, conduct on the part of Mr. Pot

ter that is really inexcusable in his advising Mrs. Curtis, to
whom he stood in such a relation of confidence, to invest in
such a precarious stock, and it is a serious question whether,
if this were all, the transaction could stand in equity. But
there is a further feature of the case that places the invalid-
ity of the transaction beyond question. It is found that at
the time of these transactions Mr. Potter was and for some
time had been, agent for Hurd, the manager of the Rolling
Stock Company, for the sale of the stock, and that he was
allowed a commission of twenty per cent. on the sales which
he effected, and that he in fact received $2,000 for the sale
of the two hundred shares which he sold for $10,000 to
Mrs. Curtis for herself and as guardian of her son. It fur-
ther appears that instead of Mrs. Curtis seeking his advice,
he took the initiative, and sought an interview with her, in-
viting her to his house at dinner (stating that he had funds
of the estate in his hands, but was not well enough to go to
see her), and at the interview there he advised her to take
this stock as an investment, which she finally did, in entire
ignorance that he had an interest in effecting the sale. It
is true his interest was only to the amount of twenty per
cent. of the stock, and the claim is made that for the other
eighty per cent. the sale was good, and he liable to make
good only the actual profit that he received. But this is a
very narrow view of the matter. His interest in making
the sale characterized and vitiated the whole transaction. It
became as a whole a breach of confidence, an abuse of trust.
The matter is not to be measured by the measure of his in-
terest, but is characterized throughout by the vicious ingre-
dient that entered into it. 2 Pomeroy's Eq. Jur., § 902, and
cases cited.

And the same reasons that invalidate this transaction
apply to the sale to her of the farm mortgages. Mr. Potter
had the same interest, as an agent selling upon a commission,
in this transaction as in the one we have considered. His
advice was not disinterested, nor such as in the circum-
stances she had a right to expect and require. The pro-
perty in this case does not appear to have depreciated, but

her right to repudiate the transaction does not rest upon a depreciation of the property, but on Mr. Potter's concealed interest in the sale. But the mortgages were in fact securities which as a guardian Mrs. Curtis had no right to invest in, and in which it was not wise that she, a woman, ignorant of business, with whom the great point of consideration must have been safety of investment, should invest her means, and which he, as her confidential adviser, ought never to have recommended to her for that purpose. As the case stands thus far both the transactions by which the Rolling Company stock and the mortgages were sold to Mrs. Curtis are open to arraignment in equity, and would be condemned by its well settled principles.

And it is to be observed that courts of probate, though not properly courts of equity, have full power to apply equity principles in dealing with cases like this ; so that the question before the probate court in this case was precisely the same as if it had been brought before a court of equity by a direct proceeding.

But the counsel for Mr. Potter say that there was no fraudulent intent on his part, and appeal to that part of the finding which states that he " believed that all the statements made by him to Mrs. Curtis concerning them (the stock and securities) were true, and that they would be a safe and profitable investment for her and her son." But it is not enough that he believed his statements to be true. In the relation in which he stood to her he ought to have known them to be so or not to have made them. It appears that he knew the speculative character of the Rolling Company stock and that there was no legal organization. And more than all, he knew that he was concealing from her his personal interest in the sales, a fact which would have prevented her accepting the property if she had known of it. If the case can be regarded as not one of actual fraud, yet it clearly is one of constructive fraud ; of fraud inferred by the law. Such a fraud will be inferred in cases where a confidential relation is used to accomplish a transaction that is injurious to the trusting party, even though there be no

actual fraudulent intent. 1 Story Eq. Jur., §§ 307, 308, 311.

As to Mr. Potter's belief in the truth of his statements, it is to be noticed that with his very limited, and as far as it went not very favorable knowledge of the affairs of the Rolling Stock Company, he "sought no further information on the subject." He therefore made his statements knowing that they were very hazardous ones. In *Evans* v. *Edmunds*, 13 Com. Bench, 777, MAULE, J., lays down the rule on this subject as follows :—" I conceive that if a man, having no knowledge whatever on the subject, takes upon himself to represent a certain state of facts to exist, he does so at his peril : and if it be done either with a view to secure some benefit to himself, or to deceive a third person, he is in law guilty of a fraud, for he takes upon himself to warrant his own belief of the truth of that which he so asserts." And Pomeroy, in his Equity Jurisprudence, vol. 2, sec. 885, says :—" A person making an untrue statement, without knowing it to be untrue, and without any intention to deceive, may be chargeable with actual fraud in equity."

It is then said that Mrs. Curtis had no right to retain the stock and mortgages so long and ought to have tendered them back if at all long before she did. Of course she was bound to repudiate the transaction within a reasonable time. Like all persons who appeal to equity for aid, or who seek to apply its principles for their protection, she had no right to sleep upon her rights. It is found that she tendered the stock and mortgages back, with all the dividends and interest received, in January, 1885, nearly three years after she took them. But it is also found that she then for the first time learned that he had received commissions for the sale of them. This was the point which was decisive as to the invalidity of the transactions, and the discovery of it gave her the right to repudiate the purchase. It surely does not lie in the mouth of Mr. Potter to complain that a decisive fact, which he concealed, was not sooner discovered by her, or that action which was predicated upon and justified by that fact was not sooner taken.

It is then said that these transactions, even if fraudulent, either in fact or in law, were wholly outside of Mr. Potter's relation to the estate as executor, and were merely between him and Mrs. Curtis, and if to be assailed at all that they are to be assailed by her by some proceeding of her own, and subjecting him personally if at all, and not as executor of Mr. Curtis.

The idea here seems to be that Mr. Potter had completed his duty as executor in paying over the money to Mrs. Curtis, and that her use of the money was wholly her own matter, and so far as she acted under his advice, it was his individual advice and not his as executor. If the facts were as claimed it would yet not deliver Mr. Potter from personal responsibility to Mrs. Curtis. The confidential relation might continue to exist after the official relation had ceased. A guardian might, on the ward's becoming of age, have paid over to him in cash, or delivered to him in specific property of the estate, all that he held as guardian, and have obtained a discharge from his guardianship by the court and a receipt in full from the ward; and yet if the ward a few days later had asked his advice as to the investment of his money the confidential relation would ordinarily have continued to exist, and any abuse of the ward's confidence by which the late guardian had promoted his own interest and brought loss upon the ward, would have been a transaction that a court of equity would set aside. This Mr. Potter's counsel would not deny, but they say that as in the case supposed the guardian would no longer be liable on his bond, but only upon a suit of the ward against him, so here, Mr. Potter would be liable, if at all, only to Mrs. Curtis personally, and not for a breach of his bond as executor, or upon objection made to an allowance of his administration account. But the facts do not at all bear out this claim. Here the money was not paid to Mrs. Curtis, but she was paid in these stocks and securities. She was of course entitled to payment in money. This is not only clear as a matter of law, but it is found that " Mr. Potter knew that as executor he ought to pay the legacies in cash." His pay-

ment of her by check payable to her order was not only a mere form, but it is found that he took a receipt from her for cash because he knew that it was his duty to pay her in cash. In the case of the sale of the stock to her as guardian he did not even resort to this form of payment, but made his check payable to Hurd and procured from him and delivered to her a certificate of the stock, taking from her a receipt for a payment in cash; the court finding that he drew the check to the order of Hurd and not to her order because he thought it would be " a useless formality." It is clear that the payments to her on her own account and as guardian were in these stocks and securities, and not in cash which she afterwards invested in the stocks and securities on his advice.

We ought perhaps to notice the point made by Mr. Potter's counsel, that Mrs. Curtis was not acting upon his advice alone, but that he advised her to consult her uncle, Mr. Bishop, and Mr. Lockwood, and that she did in fact consult Mr. Bishop. It does not appear what advice he gave her, nor whether any. The fact of Mr. Potter's advising her to consult these gentlemen should be set down to his credit upon the question of fraudulent intent on his part, but even if it be regarded as disproving such intent it could not operate to disprove a constructive fraud. The transactions would still be open to a fatal objection. But it is not clear that the fact is of any great value upon the question of actual fraud. The court has not found that Mrs. Curtis was in any manner influenced by Mr. Bishop's advice, if indeed he gave her any, but has found expressly that Mr. Potter "induced" her to take the stock and securities, and that she took them "relying upon his advice and recommendation and upon his relation to the estate." We cannot regard the case therefore as materially affected by the fact that he advised her to consult these two gentlemen and that she did in fact consult one of them.

We have thus far considered only the sales of the stock of the Rolling Stock Company and of the mortgages. It

does not appear from the finding that Mr. Potter received any commission for the sale of the railroad bond, nor indeed who owned the bond, nor that the sale was not a fair one. It is true that it was not a security in which Mrs. Curtis had a right to invest the guardian funds in her hands, and Mr. Potter, if he knew that fact, did a blameworthy act in advising such an investment. But there appears no reason why, if she had desired to repudiate the transaction, she should not have tendered back the bond before she did. The long delay in the other cases was excused by her ignorance of his concealed interest in the sales, but no such interest appears to have existed in this case, and we think that, even if the transaction was one which she would have had the right to repudiate if she had acted seasonably, she had lost that right by her delay.

The point was made before the probate court that the question as to the disallowance of these items of credit, was no longer an open one, by reason of the account personally rendered to and accepted by the court, in which these items were embraced. It appears that this account was rendered on the 14th of June, 1884, the final account from which the appeal is taken having been rendered on the 22d of March, 1886. The former accounting was a partial one, and was made without the presence of or notice to the parties in interest, and was not otherwise passed upon by the court than by its acceptance of it. In these circumstances it is very clear that the question as to the allowance or disallowance of these items was in every respect an open one on the final accounting. *Mix's Appeal from Probate*, 35 Conn., 121; *Clement's Appeal from Probate*, 49 id., 520.

There was error in the judgment of the Superior Court in reversing so much of the decree of the probate court as disallowed as credits in the administration account of Mr. Potter the items pertaining to the sales of the Rolling Stock Company's stock and the farm mortgages to Mrs. Curtis, and to her as guardian ; and no error in the affirmation of that part of the decree of the probate court which disallowed as

credits the amount which he received as commissions on those sales.

In this opinion the other judges concurred.